# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MASON D. S.[1] ,

        Plaintiff,

   v.                            Civil Action 1:25-cv-40
                                       Judge Susan J. Dlott
                                       Magistrate Judge Chelsey M. Vascura

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Mason D. S., brings this action under 42 U.S.C. § 405(g) for review of a final

decision of the Commissioner of Social Security ("Commissioner") denying his applications for

Social Security Period of Disability Benefits, Disability Insurance Benefits ("DIB") and

Supplemental Security Income Benefits ("SSI"). This matter is before the undersigned for a

Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 9); the

Commissioner's Memorandum in Opposition (ECF No. 12); Plaintiff's Reply (ECF No. 13); and

the administrative record (ECF No. 8). For the reasons that follow, the undersigned

**RECOMMENDS** that the Court **AFFIRM** the Commissioner of Social Security's non-disability

determination and **OVERRULE** Plaintiff's Statement of Errors.

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other
disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

## I.      BACKGROUND

Plaintiff filed his DIB application on February 28, 2022, alleging that he became disabled beginning February 8, 2022. Plaintiff's DIB application was initially denied. Plaintiff then filed his SSI application on August 17, 2022, and alleged the same disability onset date. Plaintiff's SSI application was escalated, and on March 20, 2023, both of Plaintiff's applications were denied upon reconsideration. An Administrative Law Judge ("ALJ") subsequently held a telephonic hearing on January 4, 2024, at which Plaintiff, accompanied by a non-attorney representative, appeared and testified. A vocational expert ("VE") also appeared and testified. On January 31, 2024, the ALJ issued an unfavorable determination (R. at 17–31), which became final on December 4, 2024, when the Appeals Council declined review. (*Id.* at 1–6.)

Plaintiff seeks judicial review of that unfavorable determination. Plaintiff contends that the ALJ reversibly erred: 1) when determining if he met or equaled certain listed impairments; 2) when assessing his subjective symptoms (*a.k.a.* making a credibility determination); and 3) when evaluating medical opinions and prior administrative findings. (Pl.'s Statement of Errors 3–13, ECF No. 9; Pl.'s Reply 1–9, ECF No. 13). The undersigned finds Plaintiff's three contentions of error lack merit.

## II.      THE ALJ's DECISION

The ALJ issued the unfavorable determination on January 31, 2024. He initially determined that Plaintiff met the insured status requirements of the Social Security Act through

December 31, 2027. (R. at 19.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 8, 2022, his alleged disability onset date. (*Id.* at19.) At step two, the ALJ found that Plaintiff had the following severe medically determinable impairments: autism spectrum disorder without accompanying intellectual impairment, attention-deficit/hyperactivity disorder (ADHD); anxiety disorder, major depressive disorder, mood disorder, and encephalopathy. (*Id.* at 19–20.) The ALJ also found that Plaintiff had the non-severe medically determinable impairment of foot pain following an injury to his foot. (*Id.* at 20.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 20.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ then set forth Plaintiff's residual functional capacity ("RFC")[3] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: requires work related to simple, routine tasks with no set hourly quotas that does not involve conveyor belts or assembly line duties. He can have no more than occasional interactive contact with coworkers and supervisors. He can have no direct interactive contact with the public. There should be no more than occasional changes in the routine work setting. He needs to avoid hazards such as moving machinery and unprotected heights but does not need to avoid hazards typically found in the workplace such as boxes on the floor or ajar doors.

(*Id*. at 22.)

At step four, the ALJ relied on testimony from the VE to determine that Plaintiff had no past relevant work. (*Id.* at 29.) Relying again on the VE's testimony at step five, the ALJ determined that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (*Id*.) Accordingly, the ALJ determined that Plaintiff was not disabled as defined in the Social Security Act during the relevant time frame. (*Id*. at 30.)

## III. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

---

[3] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations" "on a regular and continuing basis." 20 C.F.R. § 416.945(a)(1), (b)–(c).

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.    ANALYSIS

As explained above, Plaintiff contends that the ALJ erred when determining if he met or equaled listed impairments at step three, when assessing Plaintiff's subjective symptoms, and when evaluating medical opinions and prior administrative findings. (Pl.'s Statement of Errors 3–13, ECF No. 9; Pl.'s Reply 1–9, ECF No. 13). The undersigned considers each of these contentions of error in turn and concludes that none have merit.

### A.    The ALJ's Listings Determinations at Step Three

Plaintiff first contends that the ALJ erred by failing to consider if he met the criteria for Listing 12.05 at step three. He further contends that the ALJ erred when determining that he did not meet or equal Listings 12.04, 12.06, 12.10, and 12.11 at step three. Both contentions of error lack merit.

5

### 1.    Failing to Consider Listing 12.05

At step three, a claimant has the burden of showing that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 345 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If claimant meets all criteria for a listing, he is disabled; otherwise, an ALJ must proceed to the next step in the sequential evaluation process. 20 C.F.R. § 404.1520(d)–(e).

Although the regulations require an ALJ to determine if a claimant meets or equals a listed impairment, they "do not require the ALJ to address every Listing" or to "discuss listings that the applicant clearly does not meet." *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641 (6th Cir. 2013). Instead, an ALJ should consider a listing if the record "'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id.* at 641 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). But "[a] claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x. at 641–42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

Here, the ALJ considered Plaintiff's impairments and determined that during the relevant period, they did not, singly or in combination, meet the criteria for Listings 12.04, 12.06, 12.10, and 12.11. (R. at 20.) As Plaintiff correctly notes, however, the ALJ did not expressly consider if

he met the criteria for Listing 12.05—intellectual disorder. [4] Nevertheless, the ALJ did not err by failing to consider Listing 12.05 because Plaintiff fails to point to record evidence demonstrating that he could meet or equal its requirements.

Specifically, to meet the requirements of Listing 12.05, a claimant must satisfy 12.05A *or* 12.05B. Plaintiff does not point to evidence demonstrating that he can meet the requirements of either provision.

### a. 12.05

Provision 12.05A. is satisfied by 1, 2, and 3 below:

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

---

[4] Listing 12.05 defines "Intellectual disorder" as follows:

Intellectual disorder (12.05).

a. This disorder is characterized by significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22. Signs may include, but are not limited to, poor conceptual, social, or practical skills evident in your adaptive functioning.

b. The disorder that we evaluate in this category may be described in the evidence as intellectual disability, intellectual developmental disorder, or historically used terms such as "mental retardation."

c. This category does not include the mental disorders that we evaluate under neurocognitive disorders (12.02), autism spectrum disorder (12.10), or neurodevelopmental disorders (12.11).

20 CFR Part 404, Subpart P, Appendix 1, at Listing 12.00B4.

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.05.

The undersigned concludes that there is not a substantial question as to whether the ALJ should have considered 12.05A. As Plaintiff correctly notes, the record contains an IQ score from 2014, when Plaintiff was 14 years old. (Pl.'s Statement of Errors 3, ECF No. 9; R. at 288.) But according to the Social Security Administration, 12.05A(1) is used "to evaluate the claims of people whose cognitive impairment *prevent them* from taking a standardized intelligence test that would measure their general intellectual functioning." Rev. Med. Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,155 (Sept. 26, 2016) (emphasis added); *see also Polye v. Comm'r of Soc. Sec.*, No. 17-14000, 2018 WL 5649925, *5 (E.D. Mich. Oct. 3, 2018), *adopted and aff'd,* 2018 WL 563458 (E.D. Mich. Oct. 31, 2018) ("With respect to Listing 12.05A, the Commissioner correctly notes that the fact that [the claimant] received a full scale IQ score of 75 when she was in school refutes any claim that she had a 'cognitive inability to function at a level required to participate in standardized testing of intellectual functioning.'"))

For these reasons, Plaintiff does not demonstrate that 12.05A(1) applies to him. Thus, he cannot show that he meets or equals 12.05A in total.

### b. 12.05B

Because Plaintiff cannot show that he meets or equals 12.05A, he must show that he can meet or equal 12.05B. But the undersigned also finds that there is not a substantial question as to whether the ALJ should have considered 12.05B.

12.05B is satisfied by 1, 2, and 3 below:

1. Significantly subaverage general intellectual functioning evidenced by a or b:

8

     a.     A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

     b.     A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.     Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

     a.     Understand, remember, or apply information . . . . or

     b.     Interact with others  . . . .  or

     c.     Concentrate, persist, or maintain pace . . . . or

     d.     Adapt or manage oneself . . . . ; and

3.     The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.05.

Defendant correctly notes that Plaintiff's IQ score from 2014 does not satisfy 12.05B(1) for two reasons. First, the Social Security Administration's Program Operations Manual System ("POMS") [5] indicates that IQ scores from tests administered before a claimant is 16 years old are not considered "current" because IQ scores generally do not stabilize until that age. *See* POMS § 24583.055(I)(7). The POMS additionally indicates that IQ scores obtained from ages seven to 16 should be considered current for only two years, while "[i]ntelligence test results obtained at age

---

[5] POMS is used by the Social Security Administration staff to conduct daily business. "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect." *Washington Dep't of Soc. Servs. v. Keffeler,* 537 U.S. 371, 385 (2003).

16 or older may be assumed to apply to the subject's current status provided they are compatible with the individual's current behavior." *Id*.

Here, the 2014 IQ score was from a test administered when Plaintiff was only 14. Accordingly, the score was current for two years, but it is not current now for purposes of Listing 12.05B(1). *See Owens v. Comm'r of Soc. Sec.*, No. 1:14-CV-554, 2015 WL 2084703, at *10 (S.D. Ohio May 4, 2015) (citing POMS and finding that an ALJ did not err by failing to consider a previous version of Listing 12.05 because the plaintiff's IQ score was from a test administered when the plaintiff was 13).

Second, and as Defendant points out, even if the score was current, it would not satisfy 12.05B(1) because it is too high. 12.05B(1) requires proof of a full-scale IQ score of 70 or below, or a full-scale score of 71–75 accompanied by a verbal or performance IQ score of 70 or below. But Plaintiff's 2014 full scale IQ score was 77. (R. at 288.) Accordingly, even if that score from 2014 was current, it still would not satisfy 12.05B(1).

In short, Plaintiff does not point to evidence that he meets or equals 12.05B(1). Consequently, he cannot demonstrate that he can meet all of 12.05B's requirements.

### 2.    Listings 12.04, 12.06, 12.10, and 12.11

Plaintiff additionally contends that the ALJ erred when determining that he did not meet or equal Listings 12.04, 12.06, 12.10. and 12.11. In particular, Plaintiff challenges the ALJ's assessment of paragraph B of these Listings. The undersigned concludes that this contention of error also lacks merit.

As a preliminary matter, Plaintiff's contention lacks merit because he fails to demonstrate that he met or equaled all the criteria for each of these Listings. For instance, Listings 12.04 and 12.06 require a claimant to satisfy either paragraphs A and B, *or* A and C, of those Listings. 20

C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04, 12.06. As noted, however, Plaintiff only challenges ALJ's assessment of paragraph B of those Listings. To prevail, he would need to show that the ALJ erred in assessing paragraph B *and* point to record evidence that he met or equaled paragraph A, *or* he would need to point to record evidence demonstrating that he met or equaled both paragraphs A and C. Plaintiff simply does not address paragraph A (or C) of 12.04 and 12.06 in any way at all.

Similarly, Listings 12.10 and 12.11 require a claimant to satisfy both paragraphs A and B of those listings. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.10, 12.11. Again, Plaintiff challenges the ALJ's assessment of paragraph B of those Listings, but he makes no argument regarding paragraphs A of those Listings. Accordingly, the undersigned agrees with Defendant that Plaintiff's arguments are, at best, "skeletal." (Def.'s Mem. in Opp'n 4 n.4, ECF No. 12.)

In any event, the undersigned does not find that the ALJ committed reversible error when he assessed the paragraph B criteria for Listings 12.04, 12.06, 12.10, and 12.11. Paragraph B of those Listings all require evidence demonstrating the following:

> Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning . . . . :
>
> 1. Understand, remember, or apply information . . . .
>
> 2. Interact with others . . . .
>
> 3. Concentrate, persist, or maintain pace . . . .
>
> 4. Adapt or manage oneself . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04, 12.06, 12.10, 12.11.

Plaintiff first contends that the ALJ erred when determining that he had only moderate limitations in understanding, remembering, and applying information. (Pl.'s Statement of Errors 4–5, ECF No. 9.) The ALJ wrote as follows:

> In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant has reported difficulty understanding, remembering, and following instructions (Ex. 3E, p. 6). When working at a packaging facility, he had a job coach stop by 1-2 times a week to remind him of his job duties. He stated coworkers at Chipotle had also reminded him of his duties (Hearing Testimony). However, the record shows that the claimant has average intellectual functioning (Ex. 5F, p. 9; Ex. 12F, p. 4). He was able to graduate from high school, and he reported taking classes online for IT certificates (Ex. 2E, p. 3; Ex. 14F, p. 25). Upon examination, the claimant's memory was noted to be intact (Ex. 12F, p. 4; Ex. 14F, p. 2, 7, 12, 16, 21, 27). He was able to do addition and serial seven subtraction. He could spell "world" forwards and backwards correctly (Ex. 12F, p. 4). The claimant reported he can manage his personal care, cook, clean, and shop (Ex. 12F, p. 4). His mother confirmed he understood how to pay bills online (Hearing Testimony). The record indicates the claimant has no more than a moderate limitation in his ability to understand, remember, or apply information.

(R. at 20–21.)

As this discussion demonstrates, the ALJ acknowledged that Plaintiff had a job coach at one job and received assistance from coworkers when he worked at Chipotle. Even so, the ALJ found that the record showed Plaintiff had only moderate limits in this domain. Substantial evidence supports that determination. As the ALJ explained, a consultative examiner reported that Plaintiff "appeared to be functioning at an Average Intellectual level based on his verbal ability in English," and noted that he could spell words forwards and backwards and perform calculation tests. (*Id*. at 481.) Plaintiff also reported to the examiner that he could cook, clean, do laundry, and shop for groceries. (*Id*.) In addition, multiple mental status examinations documented that Plaintiff had average intelligence and intact memory. (*Id*. at 490, 495, 500, 504, 509, 515.) The ALJ also correctly observed that Plaintiff had taken online IT certificate classes. (*Id*. at 513.)

12

Plaintiff next contends that the ALJ erred when finding that that he had only moderate social interaction limitations. (Pl.'s Statement of Errors 6–7, ECF No. 9.) The ALJ wrote as follows:

> In interacting with others, the claimant has a moderate limitation. The claimant has reported some difficulty getting along with others, including his parents (Ex. 3E, p. 6; Ex. 12F, p. 3-4). His mother noted the claimant took any feedback to heart. However, the claimant testified he generally got along with others, including his coworkers (Hearing Testimony). He was able to live with his brother, and he had friends (Ex. 12F, p. 3; Ex. 14F, p. 25-26). He reported being able to grocery shop, and he worked for seven months as a fast-food cashier, indicating an ability to interact with the public appropriately (Hearing Testimony). Upon examination, the claimant has been described as calm, cooperative, well groomed, and pleasant (Ex. 4F, p. 5; Ex. 12F, p. 3- 4; Ex. 14F, p. 2, 7, 12, 16, 21, 27). The record indicates the claimant has no more than a moderate limitation in interacting with others.

(*Id*. at 21.)

A this discussion demonstrates, the ALJ acknowledged that Plaintiff reported difficulties getting along with others, including his parents. Nevertheless, the ALJ determined that Plaintiff had only moderate limitations in this area. Substantial evidence supports that determination. As the ALJ explained, Plaintiff testified that he generally got along with others. (*Id*. at 46.) The ALJ also noted that Plaintiff lived with his brother and had friends. (*Id*. at 26.) The record confirms this: Plaintiff reported having two best friends—Sam, whom he knew online, and Joe, a friend with whom he took walks. (*Id*. at 491, 512.) Plaintiff also described to providers that he had a close relationship with his older brother, Kyle, with whom he lived. (*Id*. at 490, 492.) In addition, and as the ALJ correctly explained, mental health records consistently described Plaintiff as calm, cooperative, well-groomed, and pleasant. (*Id*. at 432, 490, 495, 500, 504, 509, 515.)

Last, Plaintiff contends that the ALJ erred when finding that that he had only moderate limitations in adapting or managing oneself. (Pl.'s Statement of Errors 7–8, ECF No. 9.) The ALJ wrote as follows:

13

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant reported he was easily overwhelmed and needed a chance to recuperate a lot. When he worked at Chipotle, he took several breaks each day. Ms. Smith noted the claimant was irritable (Hearing Testimony). The record indicates that the claimant struggled with some depression in late 2023 (Ex. 14F, p. 6, 16). However, the claimant's mental status signs did not indicate a significant deterioration in the claimant's condition, though he went through a break up, lost his job, and lost his dog (see Ex. 14F, p. 2-7). The claimant was able to adjust his medications to improve his mood and frustration tolerance, which are prescribed on an outpatient basis. The claimant does not participate in counseling, has not required inpatient care, and has not been psychiatrically hospitalized since his alleged onset date. He has been able to live with his brother in a condominium and can manage his personal care, cook, do household chores, and shop (Ex. 12F, p. 3-4). He generally presented at appointments as alert, oriented, calm, and well groomed (Ex. 4F, p. 5; Ex. 12F, p. 3-4; Ex. 14F, p. 2, 7, 12, 16, 21, 27). The claimant has no more than a moderate limitation in his ability to adapt or manage himself.

(R. at 21.)

A this discussion demonstrates, the ALJ acknowledged that Plaintiff reported being easily overwhelmed, needing to recuperate, and taking several breaks a day when working at Chipotle. Nevertheless, the ALJ determined that Plaintiff had only moderate limitations in this area. Substantial evidence supports that determination. As the ALJ explained, the record reflected that although Plaintiff struggled with depression in 2023, Plaintiff's condition did not deteriorate despite situational stressors he experienced at that time. That accurately describes treatment notes from Summer Wilson, PMHNP-BC. (*Id*. at 489, 494.) The ALJ also accurately noted that Plaintiff was able to live with his brother and manage personal care, cook, do chores, and shop. (*Id*. at 78, 227, 490, 492, 481.) Moreover, the ALJ correctly explained that Plaintiff was regularly described by providers as alert, oriented, calm, and well groomed. (*Id*. at 490, 495, 500, 504, 509, 515).)

For all these reasons, the undersigned concludes that the ALJ did not reversibly err by finding that Plaintiff did not meet or equal the paragraph B criteria for Listings 12.04, 12.06, 12.10, 12.11. Plaintiff's claim to the contrary lacks merit.

14

**B.      The ALJ's Subjective Symptom Assessment**

Plaintiff also contends that the ALJ erred when performing a subjective symptom analysis. The undersigned concludes that this contention lacks merit.

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. §§ 404.1529, 416.929(c)(1); SSR 16–3p, 2017 WL 5180304, at*10 (Oct. 25, 2017). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must . . . evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must consider all available evidence from medical and nonmedical sources including medical opinions. *Id.* In addition, there are seven factors set forth in SSR 16–3p[6] that an ALJ will consider: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to

---

[6] SSR 96-7p, 1996 WL 374186 (July 2, 1996) which has been superseded by SSR 16-3p, required an ALJ to evaluate the overall credibility of a plaintiff's statements. In contrast, SSR 16-3p requires an ALJ to evaluate the *consistency* of a plaintiff's statements, without reaching the question of overall *credibility*, or character for truthfulness. 2017 WL 5180304, at *11 ("In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."). The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.,* 656 F. App'x 113, 119 n.1 (6th Cir. 2016). Therefore, the credibility determination and subjective symptom analysis are not materially different, and case law regarding the former applies with equal force to the latter.

alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or

has received for relief of pain or other symptoms; 6) any measures other than treatment an

individual uses or has used to relieve pain or other symptoms; and 8) any other factors

concerning an individual's functional limitations and restrictions due to pain or other

symptoms. 2017 WL 5180304 at *7–8; *see also* 20 C.F.R. § 404.1529(c)(3)(i)–(vii). Although an

ALJ is not required to analyze all seven factors he should show that he considered the relevant

evidence. *Roach v. Comm'r of Soc. Sec.*, No. 1:20-CV-01853-JDG, 2021 WL 4553128, at *10–

11 (N.D. Ohio Oct. 5, 2021).

The ALJ need only discuss those factors that are pertinent based upon the evidence in the

record. SSR 16–3p, 2017 WL 5180304 at *7–8. However, the ALJ's discussion of the applicable

factors "must contain specific reasons for the weight given to the individual's symptoms, be

consistent with and supported by the evidence, and be clearly articulated so the individual and

any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."

*Id.* at *10; *cf. Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a

claimant's testimony as incredible, he must clearly state his reason for doing so.").

The undersigned finds no reversible error in the ALJ's subjective symptom assessment.

The ALJ began by summarizing Plaintiff's symptoms, writing as follows:

> The claimant filed for disability benefits, alleging work-related limitations
> primarily due to a combination of mental disorders (Ex. 2E, p. 2). In his Function
> Report, it was noted that the claimant had difficulty understanding, remembering,
> following instructions, concentrating, completing tasks, getting along with others,
> and talking (Ex. 3E, p. 6). The claimant testified that he tended to lose focus. He
> was easily overwhelmed and needed a chance to recuperate a lot (Hearing
> Testimony).
>
> The claimant testified he had worked at a packaging company, where he scanned
> COVID-19 test tubes and test kits. Ms. Smith explained that the job was arranged
> through an agency that coordinated work and transportation for individuals with
> special needs. A job coach visited him 1-2 times a week and reminded him of his

> job duties. The claimant found it mentally stressful, though there were no production quotas. The claimant searched for another job and was hired to work as a cashier at Chipotle. The claimant testified that he worked 40 hours a week, but he called in sick 2-3 times a month. He took a 30-minute lunch break and four 10–15-minute breaks during his shift. The claimant testified he received help lifting objects and understanding his duties. He tended to lose focus after 30-60 minutes and became overwhelmed (Hearing Testimony).

(R. at 23.) The ALJ then determined that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" Plaintiff's statements about the "intensity, persistence and limiting effects" of his symptoms were not entirely consistent with the medical and other record evidence. (*Id*.)

The ALJ then summarized the record evidence in detail, including clinical findings related to Plaintiff's alleged tendency to lose focus. The ALJ explained that although Plaintiff "testified that he was unable to work because he tended to lose focus and was easily overwhelmed," his "attention and concentration [were] described as normal at appointments with [a psychiatric mental health nurse practitioner]." (*Id*. at 26.) Substantial evidence supports this explanation—records from Nurse Wilson repeatedly indicated that Plaintiff's mental status examinations showed normal attention span and normal concentration. (*Id*. at 490, 495, 500, 504, 509, 515.) The ALJ also correctly noted that Nurse Wilson's records repeatedly indicated that Plaintiff's examinations showed that he was alert and oriented and that his thought processes were generally logical. (*Id*. at 26 (citing R. at 490, 495, 500, 504, 509, 515).) In addition, the ALJ accurately indicated that Plaintiff was able to perform basic calculations, serial 7s, and memory tasks during a consultative examination. (*Id*. (citing R. at 481).) The ALJ wrote too that even though another provider observed that Plaintiff's thought processes were scattered, that provider still found that his intellectual capabilities were fair. (*Id*. (citing R. at 407–08).)

The ALJ also discussed Plaintiff's activities, including his work activities and activities of daily living. The ALJ explained that Plaintiff was able to perform work as a fast-food cashier for several months, which required him to process financial transactions in a timely manner. (*Id*.) The ALJ further explained that Plaintiff was reportedly able to "perform detailed tasks, such as cooking, shopping, paying bills, taking on-line IT classes, and repairing game consoles." (*Id*.) Substantial evidence supports these explanations. Plaintiff told a consultative examiner that he knew "how to do the cooking, cleaning, laundry and groceries." (*Id*. at 481.) In 2023, Plaintiff informed Nurse Wilson that he was working at Chipotle, and that he was starting an on-line business fixing gaming consoles. (*Id*. at 505, 509.) Plaintiff also informed Nurse Wilson that he was working on obtaining IT certificates online. (*Id*. at 513.)

The ALJ additionally discussed Plaintiff's social interactions. (*Id*. at 26.) The ALJ explained that although Plaintiff had been noted to be irritable with his parents, he "consistently interacted appropriately treatment providers." (*Id*.) Substantial evidence supports this explanation. Treatment providers routinely noted that Plaintiff was "cooperative." (*Id*. at 366, 370, 374, 378, 382, 386, 390, 394, 398, 490, 495, 500.) One provider described Plaintiff as "pleasant." (*Id*. at 432.) Nurse Wilson also noted that during mental status examinations, Plaintiff's affect was "pleasant, happy, and congruent to thought content." (*Id*. at 500, 509, 515.) The ALJ also accurately indicated that Plaintiff testified that he got along with coworkers. (*Id*. at 26 (citing R. at 46).) Plaintiff also told providers that "gets along with family and friends." (*Id*. at 509, 513.) The ALJ observed too that Plaintiff was able to live with his brother and that he had friends. (*Id*. at 26.) The record also substantially supports that observation—Plaintiff told Nurse Wilson that he had two best friends, Sam, who lived in Pennsylvania and who he knew online, and Joe, who lived in West Chester, and with whom he would take walks. (*Id*. at 491, 512.)

Plaintiff additionally reported that he had a girlfriend, although they had broken up. (*Id*. at 489, 494, 497.) Plaintiff further reported that he had a close relationship with his older brother, Kyle, with whom he lived. (*Id*. at 490, 492.)

Finally, the ALJ explained that the record "generally shows that [Plaintiff's] mental symptoms are managed by Abilify and Effexor prescribed on an outpatient basis" and that they "allow him to perform a broad range of activities." (*Id*. at 26.) Substantial evidence supports that explanation. In her notes, Nurse Wilson wrote that Plaintiff reported that "Effexor and Abilify [had] helped to improve [Plaintiff's] moods" and that Plaintiff's "moods had improved with the addition of Effexor to Abilify." (*Id*. at 489, 494, 499, 502.)

Plaintiff contends that the ALJ overstated Plaintiff's abilities by relying on his work at Chipotle. Plaintiff contends that he received significant accommodations at that job, including extra supervision, breaks, and rest periods and urges that it was, therefore, inappropriate for the ALJ to consider that work. (Pl.'s Statement of Errors 10, ECF No. 9.) But as explained above, the ALJ did not exclusively consider Plaintiff's work at that job. Instead, the ALJ considered a variety of factors, including Plaintiff's activities of daily living, clinical findings related to Plaintiff's alleged concentration issues, Plaintiff's social interactions, and Plaintiff's positive response to medications. These were all proper considerations.

In short, the ALJ thoroughly reviewed the evidence in this case and provided substantial support for his determination that Plaintiff's symptoms were not as disabling as alleged. Plaintiff's claim to the contrary lack merit.

## C. The ALJ's Evaluation of Medical Opinions and Prior Administrative Findings

Plaintiff additionally contends that the ALJ erred when evaluating medical opinion evidence and prior administrative findings. The undersigned concludes that this contention lacks merit.

An ALJ's RFC determination must be "based on all the relevant evidence" in a claimant's case record. §§ 404.1545(a)(1); 416.945(a)(1). The governing regulations[7] describe five categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5). An ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program s policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. *Id.* And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id.*

### 1.    Medical Opinion from Consultative Examiner, Dr. Rivera

Plaintiff challenges the ALJ's evaluation of an opinion from Dr. Rivera, who consultatively examined Plaintiff. (R. at 479–83.) The ALJ summarized Dr. Rivera's examination findings as follows:

> On February 22, 2023, the claimant underwent a psychological consultative examination via telehealth with Evelyn Rivera, Ph.D., to further develop the evidence in his claim for benefits. [Plaintiff's mother] was also interviewed. The claimant was living with his brother in a condominium owned by his mother. He reported he argued with his parents a lot. He had anger towards them because he

---

[7] Because Plaintiff's applications were filed in 2022, they are subject to regulations governing applications filed after March 27, 2017.

had issue with how he was raised. He had some anxiety that was worse when he had to talk to his friends' parents. He had some depression. He was only taking Abilify. He had been prescribed Focalin and Zoloft in the past. Dr. Rivera observed the claimant's grooming was appropriate. He had some mannerisms indicative of autism but had relatively good eye contact. His speech and thoughts were logical and coherent. He reported transient suicidal ideation but denied any intent. He denied any hallucinations. His mood was euthymic, and his energy appeared hyper. He moved around at times. He was easily irritable when speaking with his mother (Ex. 12F, p. 3). The claimant was alert and oriented. He was able to do addition and serial seven subtraction. He could spell "world" forwards and backwards correctly. His memory was intact. He appeared to have average intelligence. The claimant reported he knew how to cook, clean, do laundry, and shop for groceries. He could shower and dress himself. He did not want to drive due to his ADHD. Dr. Rivera diagnosed the claimant with autism spectrum disorder, unspecified depressive disorder with anxious features, and ADHD (Ex. 12F, p. 4).

(*Id*. at 24.) The ALJ also summarized Dr. Rivera's opinion as follows:

Dr. Rivera opined that the claimant's depressed mood, difficulty controlling his irritability/anger, anxiety, social skill deficits, attention difficulties, and his limited coping skills will affect his ability to respond appropriately to supervision/coworkers in a work setting (Ex. 12F, p. 5). These features would also affect his ability to respond appropriately to work pressures in a work setting. He would probably need vocational services to maintain employment (Ex. 12F, p. 6).

(*Id*. at 27.) The ALJ then evaluated Dr. Rivera's opinion and determined that it was only partially

persuasive. The ALJ wrote as follows:

The undersigned finds Dr. Rivera's opinion to be partially persuasive. Dr. Rivera has disability program knowledge. She specializes in mental health issues. She personally evaluated the claimant and provided her findings in a detailed report. However, her opinion is not well supported by her own observations. The claimant acknowledged and displayed irritability towards his mother but interacted appropriately with Dr. Rivera. He demonstrated an ability to perform tasks on the spot, including calculations and memory tasks during the examination. Other evidence in the record shows the claimant interacted appropriately with Ms. Wilson and other treatment providers. He testified that he got along well with others, including coworkers. He is able to live with his brother and maintain friendships. As for his ability to respond to work pressures, the evidence shows the claimant's judgement and insight are intact. His executive functioning is normal. He can manage funds, cook, do chores, and shop. Importantly, after Dr. Rivera made this assessment, the claimant was able to find and maintain employment for seven months at Chipotle without formal vocational services to support him. He performed work as a cashier, which required him to interact directly with the public and coworkers. The work environment was fast paced, as the restaurant served food

21

immediately after it was ordered. The claimant reported doing well at the job until he went through a breakup and did not show up for work. The claimant's examination signs, daily activities, and work history are not consistent with Dr. Rivera's assessment.

(*Id*. at 27–28.)

As this discussion illustrates, the ALJ considered the supportability factor and found it lacking because Dr. Rivera' opinions were not fully supported by her own observations. Substantial evidence supports that determination. Dr. Rivera opined that Plaintiff's irritability, anger, and social skill deficits would limit his ability to respond appropriately to supervision or coworkers or work pressure. (*Id*. at 482–83.) Yet, as the ALJ noted, Dr. Rivera's own examination reflected that even though Plaintiff was irritable with his mother, he interacted appropriately with Dr. Rivera by making "good eye contact," and displaying "relatively good social skills" during his evaluation. (*Id*. at 27, 481.) The ALJ further noted that despite opining that Plaintiff would have issues responding to work pressure, Dr. Rivera's evaluation found that Plaintiff was able to "perform tasks on the spot," including calculations and memory tests. (*Id*. at 27, 481.)

The ALJ also considered the consistency factor and found it lacking. Although Dr. Rivera opined that Plaintiff's irritability and social skill deficits would impede his workplace interactions, other treatment providers—including Nurse Wilson—consistently described Plaintiff as "cooperative," "pleasant," or "happy." (*Id*. at 366, 370, 374, 378, 382, 386, 390, 394, 398, 432, 490, 495, 500, 509, 515.) The ALJ also accurately noted that Plaintiff testified he got along with others, lived with his brother, and maintained friendships. (*Id*. at 27–28, 46, 490–92, 509, 512–13.) Similarly, although Dr. Rivera opined that Plaintiff would struggle to respond appropriately to work pressures, the ALJ correctly noted that other examinations documented intact insight, intact judgment, and normal executive functioning. (*Id*. at 490, 495, 500, 504, 509,

515.) Likewise, the ALJ wrote that Plaintiff's daily activities, which included shopping and paying bills online, were inconsistent with Dr. Rivera's opinions. (*Id*. at 28, 78, 227.)

The ALJ further determined that Dr. Rivera's opinions were inconsistent with Plaintiff's work history. Dr. Rivera opined that Plaintiff would "probably need vocational services to maintain employment." (*Id*. at 483.) But, as the ALJ explained, after Dr. Rivera's evaluation, Plaintiff was able to find and maintain a job as a cashier for seven months at a Chipotle without any formal vocational services. (*Id*. at 28.)

Plaintiff, however, challenges the ALJ's reliance on his work at Chipotle to discount Dr. Rivera's opinion. (Pl.'s Statement of Errors 12, ECF No. 9.) He points out that his manager at Chipotle submitted a statement indicating he received "significant accommodations," including reduced or easier duties, special transportation, additional breaks, frequent absences, and extra help or supervision. (*Id*. (citing R. at 274).) Defendant responds that the ALJ acknowledged that Plaintiff received such assistance but noted that it did not constitute "formal vocational services" such as the assistance of a job coach. (R. at 28–29.)

The record appears to support the ALJ's characterization. Plaintiff testified that he had a job coach while working at a different position, but that he obtained the job at Chipotle on his own. (*Id*. at 50–51.) Plaintiff further testified that he was given extra help at Chipotle, including help with lifting items and understanding his job duties. (*Id*. at 51.) But Plaintiff does not point to record evidence demonstrating that such assistance came from formal job services, such as a job coach, as opposed to coworkers or supervisors. The ALJ also discussed the statement submitted by Plaintiff's manager in the determination, writing as follows:

> On December 20, 2023, Devin Stevens, a Chipotle general manager, completed a work activity questionnaire on behalf of the claimant. Mr. Stevens noted the claimant worked 40 hours a week. He did not complete all the usual duties required for his position, was not able to complete his duties without special assistance, did

> not regularly report for work as scheduled, and did not (on average) complete his work in the same amount of time as employees in similar positions. The claimant had fewer or easier duties, special transportation, more breaks, frequent absences, and extra help/supervision (Ex. 15E). The undersigned does not assign this statement a degree of persuasiveness, as it is from a nonmedical source. However, the undersigned notes that this assessment was offered a month after the claimant was fired from Chipotle for failing to show up for work after a breakup. Prior to that, the claimant had worked there for seven months. He had been able to find the job independently, apply for it, and maintain it for an extended period. He was assigned to be a cashier, which required him to interact with members of the public in a polite fashion and to promptly manage financial transactions . . . .

(*Id.* at 28–29.) As this discussion demonstrates, the ALJ explicitly acknowledged that Plaintiff had assistance or lighter duties at his job. Accordingly, the undersigned concludes that the ALJ did not ignore or overlook the special circumstances of Plaintiff's work at Chipotle.

In any event, the ALJ did not rely exclusively on Plaintiff's work at Chipotle to discount Dr. Rivera's opinions. Instead, the ALJ determined that the opinion was not supported by Dr. Rivera's own observations and that it was inconsistent with other clinical findings, Plaintiff's daily activities, *and* Plaintiff's work history, including the work he did with assistance at Chipotle. Accordingly, the undersigned finds that the ALJ did not reversibly err when evaluating Dr. Rivera's opinion.

### 2. Prior Administrative Findings

Plaintiff also challenges the ALJ's evaluation of prior administrative findings. Plaintiff's file was reviewed by a state agency reviewer, Charles Lawrence, Ph.D.[8] The ALJ summarized Dr. Lawrence's prior administrative findings as follows:

> Charles Lawrence, Ph.D., a State agency psychological consultant, reviewed the record and found the claimant was able to understand and recall simple and detailed instructions. He could sustain concentration adequately to persist on tasks to completion at an acceptable pace without need for special accommodations. He should not be expected to maintain the extended concentration needed to perform

---

[8] When Plaintiff's file was reviewed initially, it apparently contained insufficient evidence. (R. at 65.)

at a pressured pace. He could function effectively where there was minimal need for close supervision or for frequent, intensive interactions with coworkers or members of the public. He could observe safety precautions. He could adjust to infrequent, predictable changes in routines in a stable, non-pressured environment (Ex. 5A).

(*Id*. at 28.) The ALJ then evaluated these prior administrative findings and determined that they were mostly persuasive. The ALJ wrote as follows:

The undersigned finds the prior administrative psychological finding to be mostly persuasive. Dr. Lawrence is familiar with the Agency's disability program. He specializes in mental health issues. He cited specific evidence in support of his assessment. Their opinion is consistent with the claimant's mental status signs and treatment history, which shows the claimant's symptoms been fairly stable on medication throughout the period at issue. It is consistent with the claimant's broad range of activities, including managing his personal care, cooking, cleaning, shopping, handling funds, and working at times for extended periods.

(*Id*.)

As this discussion demonstrates, the ALJ considered the supportability and consistency factors. (*Id*.) The ALJ determined that the findings were consistent because Dr. Lawrence cited evidence when making his findings and that his findings were consistent with other evidence including Plaintiff's mental status examination findings, treatment history, and activities. (*Id*.)

Plaintiff contends, however, that the ALJ erred by failing to include in his RFC limits found by Dr. Lawrence. (Pl.'s Statement of Errors 12, ECF No. 9.) For instance, he contends that Dr. Lawrence found that he "should not be expected to maintain the extended concentration needed to perform at a pressured pace" and that the ALJ failed to incorporate that limit into his RFC or explain its omission. (Pl.'s Statement of Errors 12, ECF No. 9.) But the ALJ included in Plaintiff's RFC a limit to "simple, routine tasks with no set hourly quotas that does not involve conveyor belt or assembly line duties." (R. at 22.) A "limitation to simple, routine, repetitive tasks adequately conveys [a claimant's] moderately-limited ability to maintain attention and concentration for extended periods," unless there is evidence in the record of a more specific,

concrete limitation on a claimant's ability to maintain concentration, persistence or pace while doing simple unskilled work. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 437 (6th Cir. 2014). Here, Plaintiff points to no record evidence of a more specific concrete limitation.

Similarly, Plaintiff contends that Dr. Lawrence found that he could function in a setting with "minimal need for close supervision or frequent, intensive interactions with coworkers or members of the public" and that the ALJ failed to incorporate that limit into his RFC or explain its omission. (Pl.'s Statement of Errors 12, ECF No. 9.) Again, however, the ALJ included in Plaintiff's RFC a limit to "no more than occasional interactive contact with coworkers or supervisors" and "no direct interactive contact with the public." (R. at 22.) That limit accommodated Dr. Lawrence's frequency finding and arguably went farther—Dr. Lawrence found that Plaintiff's contact with the public should be infrequent, but the ALJ limited Plaintiff to no contact with the public.

Last, Plaintiff contends that Dr. Lawrence found that he "could adjust to infrequent, predictable changes in a routine" in a "stable, non-pressured environment" and that the ALJ failed to incorporate that limit into his RFC or explain its omission. (Pl.'s Statement of Errors 12, ECF No. 9.) But the ALJ limited Plaintiff to "routine tasks" and "no more than occasional changes in routine work setting." (R. at 22.) These limits also adequately accommodated Dr. Lawrence's findings.

As a result, the undersigned does not conclude that the ALJ reversibly erred when evaluating prior administrative findings from Dr. Lawrence. Plaintiff's claim to the contrary lack merit.

## V. CONCLUSION and RECOMMENDED DISPOSITION

For all the foregoing reasons, the undersigned concludes that the ALJ did not err when making Listing determinations at step three, when performing a subjective symptom assessment,

26

or when evaluating medical evidence and prior administrative findings. As a result, it is
**RECOMMENDED** that the Court **AFFIRM** the Commissioner's non-disability determination
and **OVERRULE** Plaintiff's Statement of Specific Errors. (ECF No. 7.)

## VI. PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of
this R&R, file and serve on all parties written objections to those specific proposed findings or
recommendations to which objection is made, together with supporting authority for the
objection(s). A District Judge of this Court shall make a *de novo* determination of those portions
of the R&R or specified proposed findings or recommendations to which objection is made.
Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or
in part, the findings or recommendations made herein, may receive further evidence or may
recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a
waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a
waiver of the right to appeal the decision of the District Court adopting the R&R. *See Thomas v.
Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE